UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA           :
                                   :      **OPINION AND ORDER**
v.                                 :
                                   :      S1 18 CR 206 (VB)
JOSHUA WILLIAMS                    :
and HAROLD BROWN,                  :
                     Defendants.   :
--------------------------------------------------------x

Briccetti, J.:

Defendants Joshua Williams and Harold Brown are each charged with possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Brown is also charged with possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i).

Before the Court are motions by Williams and Brown to suppress evidence seized during the search of an apartment at 25 Pierces Road, Unit #22, in Newburgh, New York (the "apartment"), pursuant to Fed. R. Crim. P. 12(b)(3). (Docs. ##11, 14). Defendants argue that what the government characterizes as a "protective sweep" was actually a warrantless search for which no exception to the exclusionary rule applies, rendering evidence seized pursuant to a subsequent search warrant fruit of the poisonous tree.

The Court agrees. Accordingly, the motions to suppress are GRANTED.

**FACTS**

The following findings of fact are based on the evidence adduced at a suppression hearing held on December 11, 2018, consisting of the testimony of City of Newburgh Police Officers James Zaccone, Humberto Perez, Joseph Palermo, and William Hinspeter; body worn camera footage and corresponding transcripts; photographs taken at the scene; the recording of a 911

call; and other exhibits.[1]

On November 18, 2017, several City of Newburgh police officers responded to a 911 call regarding an unresponsive man in the apartment. Before responding to the call, only one of the four testifying officers had previously been to the apartment complex, and none of the officers had been to the particular unit or was familiar with its occupants. The officers described the neighborhood—unlike some others in Newburgh—as a quiet, low-crime area where they infrequently responded to dispatch calls.

Officer Zaccone was the first officer to arrive, at 6:12 p.m. He encountered three individuals, later identified as Williams, a frequent overnight guest, Brown, a resident, and Nicole Callahan, a friend. Williams and Callahan led Officer Zaccone upstairs to a second-floor bedroom, where Officer Zaccone saw an unresponsive, heavyset man, later identified as Eric Conner, on the bed. (GX 5).[2] Mr. Conner was naked and lying on his back and had blood under his nose. (Tr. 9–10).[3] Callahan told Officer Zaccone that Conner was sick, and had high blood pressure and congestive heart failure. (GX 5T at 1–2). Officer Zaccone began to perform CPR. Conner had no pulse, his skin was cold to the touch, and he was not breathing. (Tr. 10–11).

At 6:13 p.m., Sgt. Timothy Gliedman and Officers Perez and Hinspeter entered the bedroom and asked Williams and Callahan to wait downstairs. None of the civilians was patted down. Officer Zaccone noted: "I didn't feel like they were a threat." (Tr. 11).

Officer Zaccone described Conner's condition to Sgt. Gliedman: "He's cold and stiff, Sarge." Officer Hinspeter asked Officer Zaccone how long he thought Conner had been there,

---

[1] These findings are not in any way based on defendants' affidavits submitted in support of the motions.
[2] "GX __" refers to the government exhibits received in evidence at the hearing.
[3] "Tr. __" refers to the hearing transcript.

and Officer Zaccone replied, "He's pretty stiff."  Officer Hinspeter touched Conner's body and added, "He's got rigor already."  (GX 5T at 3).  Officer Perez testified the officers could tell Conner "was not breathing.  We each checked and there was no pulse.  He was cold and stiff." (Tr. 52).  Around this time, Officer Palermo arrived but did not immediately go upstairs.  (GX 4).

At 6:14 p.m., Officers Palermo and Perez interviewed Williams, Brown, and Callahan on the first floor and asked them to provide identification and information about Conner's health.  (GX 4).  Williams, Brown, and Callahan provided identification and told the officers that Conner had "congestive heart failure" and "sleep apnea."  (GX 4T at 1).

At 6:16 p.m., a team of paramedics from Mobile Life, an ambulance company, arrived at the apartment, and Officer Palermo accompanied them upstairs.  (GX 4; Tr. 54).  Officer Palermo testified he helped the Mobile Life team perform CPR on Conner, although he could not recall if Conner was cold or stiff.  (Tr. 128–29).  Officer Palermo then waited at the top of the stairs to prevent "anyone else from coming up."  (Tr. 91).

At 6:18 p.m., a second Mobile Life team arrived.  (Tr. 55).  Shortly after their arrival, Officer Palermo approached Officer Hinspeter about performing a protective sweep.  (Tr. 167).  Officer Palermo testified he determined "that the scene would not be safe without [a] protective sweep" (Tr. 122), and he believed a sweep was necessary because "[t]he circumstances of the aided party were unknown to me" (Tr. 96).  He explained:  "There was no obvious signs of trauma on the body and the blood from the nose made me want to conduct a protective sweep." (Tr. 96).

Officer Hinspeter testified Officer Palermo wanted to "perform a protective search of the upstairs . . . because it was not clear to him what was going on."  (Tr. 167).  Officer Hinspeter said Officer Palermo "thought something wasn't right" and he "needed to figure out what was

3

going on." (Tr. 167). Officer Hinspeter did not testify that he had any concerns of his own about officer safety or that there was any basis for the sweep other than what he had been told by Officer Palermo.

Sometime between 6:18 and 6:20 p.m.,[4] Officers Palermo and Hinspeter conducted a protective sweep of a second bedroom across the hall from Conner's bedroom, later identified as Brown's bedroom. (Tr. 97-98). The door to Brown's bedroom was slightly ajar and the lights were off. (Tr. 98). Officer Palermo drew his firearm (which had a light attached) from its holster and entered the bedroom. (Tr. 98). He checked the closet in Brown's bedroom, where he observed a black handgun in plain view on the closet shelf. (Tr. 99; GX 3). Officers Palermo and Hinspeter also observed what appeared to be marijuana and cocaine in plain view on a dresser. (Tr. 102, 158). The protective sweep of Brown's bedroom was conducted in a matter of seconds. (Tr. 113).

Officer Palermo and Officer Hinspeter then conducted a sweep of Conner's bedroom, where they located a locked door. (Tr. 103). Officer Hinspeter yelled downstairs to ask where the door led. Brown and Callahan yelled upstairs that it was an en suite bathroom, locked because it was dirty and never used. They told the officers to open it. (GX 4T at 5–7). Shortly thereafter, Officer Palermo kicked open the locked door. (Tr. 104). No contraband was found in the bathroom. (Tr. 105, 161).

There was no evidence officers conducted a protective sweep anywhere else in the apartment. (Tr. 98, 157-59).

Later that night, Detective Yovany Rodriguez submitted an affidavit and application for a search warrant to the Newburgh City Court stating the police had

---

[4] The exact time is unknown, because it is not shown on any officer's body worn camera footage.

probable cause to search for guns and drugs based on the detective's conversation with Officer Palermo and the evidence discovered during the protective sweep. Detective Rodriguez noted that after seeing the unconscious man bleeding from the nose, Officer Palermo "thought there may have been foul play." The affidavit also states that officers

> performed a protective sweep of the upstairs to make sure there aren't more people upstairs. During the protective sweep of the adjacent bedroom PO Palermo noticed, in plain view in an open dresser drawer, a clear plastic baggie which contained suspected marijuana, a scale on top of the dresser with a white powdery substance suspected to be cocaine, and the handle of what appears to be a semi-automatic handgun with the hammer cocked back on a shelf in the closet.

(Doc. #15-2, Ex. B at 2). Based on the affidavit, a City Court judge found probable cause and issued a search warrant. (Id. at 4–5). Upon executing the warrant, the officers seized a loaded .22 caliber Walther model P22 handgun, a loaded HiPoint model C9 9mm pistol, a shotgun, ammunition, a ballistic vest, marijuana, cocaine, a digital scale, and packaging materials. (Id. at 6–17).

## DISCUSSION

I. The Protective Sweep Doctrine

The Fourth Amendment, which protects the "right of the people to be secure . . . against unreasonable search and seizure," permits a "quick and limited" warrantless search, or protective sweep, when a reasonably prudent officer believes "the area to be swept harbors an individual posing a danger to those on the . . . scene." Maryland v. Buie, 494 U.S. 325, 327, 334 (1990). Although the Supreme Court in Maryland v. Buie found that officers may conduct a protective sweep incident to arrest, officers may also conduct a protective sweep when they are "present in a home under lawful process." United States v. Miller, 430 F.3d 93, 98 (2d Cir. 2005).

The rationale for allowing protective sweeps is straightforward—police officers are permitted "to take reasonable steps to ensure their safety." Maryland v. Buie, 494 U.S. at 334.

5

As the Second Circuit has explained, "the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves." United States v. Hassock, 631 F.3d 79, 85 (2d Cir. 2011). Therefore, to justify a protective sweep, officers must point to "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer" in believing that an individual hiding in the swept area poses a danger to those on the premises. Maryland v. Buie, 494 U.S. at 334; accord United States v. Morgan Vargas, 376 F.3d 112, 116 (2d Cir. 2004).

Articulable facts demonstrating a threat to officers' safety can include, for example, specific threats against those at the scene, United States v. Miller, 430 F.3d at 101; shuffling noises or movements from behind a door, United States v. Taylor, 248 F.3d 506, 514 (6th Cir. 2001); an at-large suspect known to be armed and dangerous inside the premises, United States v. Winston, 444 F.3d 115, 119 (1st Cir. 2006); and a report of a gunshot from a premises known for drug trafficking, United States v. Lawlor, 406 F.3d 37, 42 (1st Cir. 2005).

Courts have cautioned, however, that a single factor can be insufficient to justify a protective sweep. United States v. Delgado-Perez, 867 F.3d 244, 252–53 (1st Cir. 2017). To that end, the Second Circuit has rejected protective sweeps lacking specific and articulable facts. For example, in United States v. Morgan Vargas, the defendant permitted two agents to look around his hotel room. 376 F.3d at 113. The agents' additional search of the bathroom without the defendant's consent was not a valid protective sweep, because it was unreasonable to believe anyone else was present, much less a dangerous individual. Id. at 116. A similar absence of articulable facts undermined the validity of a protective sweep in United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005). Officers who sought to interview a compliant resident

in his apartment had no cause to search the apartment "for safety" reasons when officers lacked an objectively credible fear of danger. Id. at 259.

II.  The Search Here Was Not a Lawful Protective Sweep

The government argues Officer Palermo reasonably feared for the safety of those at the scene, because a man was found dead with blood on his face and it was not immediately apparent what (or who) killed him. These facts alone, however, are not enough to show a reasonable belief that a threat was lurking upstairs. And, when considered with the other information known to the officers, the circumstances surrounding Mr. Conner's unexplained death do not give rise to an objectively credible belief that a dangerous individual was hiding in the apartment. Any determination otherwise became less and less objectively credible as the minutes passed.

For instance, the officers arrived at the scene knowing the apartment complex was in a quiet, low-crime neighborhood, and they were not aware of any prior criminal activity in Unit #22. The defendants and Ms. Callahan actively sought assistance from the officers by calling 911 and requesting their presence for a medical emergency. Indeed, when the first officer arrived, at least two of the apartments' occupants were waiting outside, and they quickly explained that Conner was seriously ill and urged the officer to check on him. Within seconds, the officer saw that Conner was likely dead. Conner was not shot or stabbed. No officer observed any trauma to Conner's body. Williams, Brown, and Callahan, though visibly upset, were cooperative, telling officers of Conner's history of congestive heart failure, current conditions, and medications. They did nothing to interfere with or impede the officers' investigation.

As time passed and the officers gained more information, any articulable fear of a hidden

threat diminished. Officers on the premises, with whom Officer Palermo was in communication, noted within seconds of their arrival that Conner was "cold and stiff" and "got rigor already." (Tr. 52; GX 5T at 3). From those remarks, the only rational inference was that Conner had been dead for some time prior to the officers' arrival. If a threat ever existed, it would have existed at the time of Conner's death, and the fact that some time had elapsed after his death indicated that any such threat had abated, at least somewhat.

The inference that the threat, if any, had abated is further supported by Officer Palermo's brief delay in performing the protective sweep, and the other officers' decision not to perform a protective sweep at all. Before conducting the sweep, Officer Palermo remained either downstairs interviewing the civilians or on the stairwell's landing for at least four minutes. During that time, at least four other officers were on the scene upstairs, and after evaluating the circumstances, none had performed a protective sweep. Neither Officer Zaccone, who was alone with the civilians and with Conner's body in the bedroom, nor Officer Perez, who observed Conner's body and interviewed the civilians downstairs, testified to any apparent threat. Although the Court evaluates the facts through the eyes of a reasonable officer, not any particular officer, it is telling that several other officers encountering the same circumstances did not feel the need to conduct a protective sweep.

The government argues the exigent circumstances here—namely, the 911 call and Conner's death and physical condition—render the search constitutional for two reasons: the existence of exigent circumstances supports an officer's decision to perform a protective sweep, and exigent circumstances obviate concerns that the search was a pretext to unlawfully gather evidence.

The Court disagrees.

First, while certain types of exigent circumstances undoubtedly can support the need for a protective sweep, the government relies on cases in which officers were called to quell emergencies involving violence and weapons. See, e.g., United States v. Dabrezil, 603 F. App'x 756, 760 (11th Cir. 2015) (responding to a 911 call reporting a domestic assault with injuries); United States v. Rodriguez, 601 F.3d 402, 406 (5th Cir. 2010) (responding to a 911 call for a "volatile domestic dispute situation" which officers were told involved a gun); United States v. Ashburn, 2014 WL 1800409, at *5 (E.D.N.Y. May 6, 2014) (responding to a 911 call that a gun had been fired inside a group residence). Here, by contrast, officers were dispatched to an emergency medical call, not to an altercation or other violent dispute involving a weapon. Moreover, even if an officer's decision to perform a protective sweep is somehow more reasonable in response to an emergency call, for all the reasons already explained, it was likely apparent to the officers at the scene that if an emergency had once existed, it had since ended.

Second, the government's focus on whether the potential for pretext is greater in consent entries than when the police enter premises under exigent circumstances is a red herring. In either case, the central inquiry is the same: Would a reasonable officer have believed a hidden individual posed a risk to those at the scene? If the answer is no, the search is not necessarily pretextual. Indeed, here, the Court finds no evidence of pretext. The officers' testimony and the body worn camera footage show that despite the ongoing emergency, the officers were professional, thorough, and concerned about the safety of those present. No questions were raised as to the officers' credibility and intentions. Even crediting the testimony of the officers, however, there are simply too few articulable facts and rational inferences to reasonably indicate any hidden danger was present.

What happened here is that Officer Palermo had a hunch there might be someone in the

9

bedroom across the hall from Mr. Conner's bedroom or in the en suite bathroom in Conner's bedroom who posed a threat to officers' safety. It turned out his hunch was wrong. But more importantly, a hunch is just not the same as articulable facts and the rational inferences to be drawn therefrom that would warrant a reasonably prudent police officer in believing that someone hiding in those places posed a danger to officers or anyone else.

Accordingly, the officers did not conduct a lawful protective sweep.

III.  Evidence Seized Pursuant to Search Warrant Must Be Suppressed

Because the protective sweep was unlawful, the Court must determine whether evidence seized pursuant to the subsequently obtained search warrant should be suppressed.

Evidence seized during an illegal search should not be included in a search warrant affidavit. See United States v. Trzaska, 111 F.3d 1019, 1026 (2d Cir. 1997) (citing Wong Sun v. United States, 371 U.S. 471, 484–85 (1963)); see also United States v. Kurniawan, 627 F. App'x 24, 25–26 (2d Cir. 2015) (summary order) (noting evidence observed during unlawful sweep should not have been included in subsequent affidavit). While "the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant," the Court must "excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." United States v. Reilly, 76 F.3d 1271, 1282 n.2 (2d Cir. 1987) (quoting United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987) (internal quotations and alternations omitted)).

The search warrant application here was based almost entirely on the gun and drugs observed during the unlawful protective sweep. Excising the tainted evidence, the warrant plainly was not supported by probable cause. Indeed, the government does not contend

otherwise. Nor does the government contend that the good faith exception to the exclusionary rule, or any other exception, would save the search.

Accordingly, the evidence found during the unlawful protective sweep must be suppressed. Likewise, all evidence seized pursuant to the resulting search warrant must be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. at 488.

**CONCLUSION**

The motions to suppress are GRANTED.

Dated: February 12, 2019
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge